1    Paul A. Reynolds  (Cal. Bar No. 179656)
     preynolds@reynoldsapc.com
2    REYNOLDS APC
     402 West Broadway, Suite 2700
3    San Diego, CA  92101-8567
     Tel: 619-696-6900
4    Fax: 619-374-2842

5    Attorneys for Defendant
     TENEDORA DE EMPRESAS, S.A. DE C.V.
6

7                    **UNITED STATES DISTRICT COURT**

8                  **SOUTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 DONALD R. SWORTWOOD, as Trustee for the Donald R. Swortwood Trust Dated July 7, 1995; LETITIA H. SWORTWOOD, as Trustee of the Letitia H. Swortwood Revocable Trust #1 Dated September 16, 1992; SCOTT PANCOAST, an individual; and BENJAMIN GREENSPAN, an individual, | CASE NO. 13-CV-0362-BTM-BLM<br><br>Assigned for all purposes to: Hon. Barry Ted Moskowitz Dept. 15B<br><br>**DEFENDANT TENEDORA DE EMPRESAS, S.A. DE C.V.'s MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | **Hearing:  October 3, 2014 at 11:00 a.m.** |
| TENEDORA DE EMPRESAS, S.A. DE C.V., a Mexico corporation; NEOLOGY, INC., a Delaware corporation, SMARTRAC, N.V., a Netherlands corporation; FRANCISCO MARTINEZ de VELASCO CORTINA, an individual; and Does 1 through 10, inclusive, | **PER CHAMBERS, NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |
| Defendants. | Action Filed:  February 13, 2013<br>Pre-Trial Conf.:  October 14, 2014 |

23

24

25

26

27

28

---

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………………1

II.     THE COURT SHOULD GRANT SUMMARY JUDGMENT IN
        FAVOR OF TENEDORA ON ALL OF PLAINTIFFS' CLAIMS…………...1

        A.      Plaintiffs' Claim For Breach of Fiduciary Duty Fails as a Matter of
                Law……………………………………………………………………1

                1.      Plaintiffs' Claim That Tenedora Breached Fiduciary Duties
                        by Converting Series A and C to Common Stock is Barred by
                        Law of the Case……………………………………………………1

                2.      Plaintiffs' Claim That Tenedora Breached Fiduciary Duties
                        Simply By Acquiring the ChinaVest Shares Has No Support
                        in Law……………………………………………………………2

                3.      Plaintiffs' Theory Regarding Tenedora's Alleged
                        Misappropriation of Neology's Assets Fails For Multiple
                        Reasons……………………………………………………………2

                        a.      The Claim Fails as The Acquisition of the ChinaVest
                                Shares Was Not Part of the Challenged Transaction……...2

                        b.      The Claim Fails for Lack of Causation Because
                                Tenedora Would Have Bought the ChinaVest Shares
                                Anyway……………………………………………………3

        B.      Plaintiffs' Breach of Contract Claim That the Automatic Conversion
                Violated the Certificate of Incorporation Fails as a Matter of Law…….6

        C.      Plaintiffs' Claim That Tenedora's Purchase of the ChinaVest Shares
                Breached the Voting Agreement Fails as a Matter of Law……………9

                1.      The Failure to Amend the Voting Agreement Before Acquiring
                        the ChinaVest Shares Did Not Breach it………………………..9

                2.      Even Assuming The Voting Agreement Did Need to Be
                        Amended for the Right to Designate the ChinaVest Director to
                        Transfer With the Shares, that Did Not Cause the Harm
                        Plaintiffs Complain Of……………………………………....14

                3.      Independently, Plaintiffs' Voting Agreement Claim is Barred
                        By Acquiescence………………………………………………17

        D.      Plaintiffs' Misrepresentation Claims Fail as a Matter of Law………..18

                1.      The Claim That Tenedora Misrepresented it Would Loan
                        Money to Martinez and Cropper to Buy the ChinaVest
                        Shares Fails as a Matter of Law………………………………18

                2.      The Misrepresentation Claims Arising Out of Tenedora's
                        Alleged Misappropriation of Neology's Assets Also Fail…..…23

        E.      Plaintiffs' Ineffective Tender Claim is Factually Incorrect as a
                Matter of Undisputed Fact……………………………………………24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F.   Plaintiffs' Claims for Constructive Trust and Declaratory Relief Are Just Remedies and Fail Because All Their Substantive Claims Do…..25

III.   CONCLUSION………………………………………………………25

# TABLE OF AUTHORITIES

**CASES**

*Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381 (Del. 2010)………………9, 15

*Amirsaleh v. Board of Trade*, 2008 WL 4182998 (Del. Ch. Sept. 11 2008)……...7, 8

*Aspen Advisors, LLC v. United Artists Theater Co.*, 843 A.2d 697 (Del. Ch. 2004),

    *aff'd*, 871 A.2d 1251 (Del. 2004)…………………………………………………7

*DTND Sierra Investments LLC v. Bank of New York Mellon Trust Co., N.A.*,

    958 F. Supp. 2d 738, 753 (W.D. Tex. 2013)……………………………………..25

*Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821 (Del. 1995)………………4, 5

*E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996)…………..10

*Frontier Oil Corp. v. Holly Corp.*, 30 Del. J. Corp. L. 993 (Del. Ch. 2005)…..…....7

*Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400 (Del. 2013)…………...8

*Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241

    (Del. Ch. May 13, 1997)…………………………………………………...16

*Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872 (Del. Ch. 2009)…………………..6

*Laws v. Webb*, 658 A.2d 1000 (Del. 1995)………………………………………..4

*Lehman Brothers Holdings, Inc. v. Spanish Broadcasting System, Inc.*,

    2014 WL 718430 (Del. Ch. Feb. 25, 2014)……………………………………..17

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010)…..………………………6, 7, 8, 9, 10

*New Castle County v. Crescenzo*, 1985 WL 21130 (Del. Ch. Feb. 11, 1985)……....21

*Perlegos v. Atmel Corp.*, 2007 WL 475453 (Del. Ch. Feb. 8, 2007)……………..…21

*Smith v. Smitty McGee's, Inc.*, 1998 WL 246681 (Del. Ch. May 8, 1998)…………..3

*Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del. 1983)……………18

*Swortwood, et al. v. Tenedora de Empresas, S.A. de C.V.*, 2014 WL 1664480

    (9th Cir. April 28, 2014)…………………………………………………...1

*Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654

    (Del. Ch. 2006)………………………………………………………..25

*Thorpe v. Castleman*, 676 A.2d 436…………………………………………5

*Vizcaino v. United States Dist. Ct. for W. Dist. Of Wash.*, 173 F.3d 713,

    amended 184 F.3d 1070 (9th Cir. 1999)……………………………………1

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006)………..14

*WaveDivision Holdings, LLC v. Millenium Digital Media Systems, L.L.C.*,

    2010 WL 3706624 (June 18, 2010)……………………………………..15

MISCELLANEOUS

Restatement (Second) of Torts…………………………………………………4

Restatement (Second) of Torts, § 432…..………………………………………5

Restatement (Second) of Torts, § 432(1)………………………………………5

Restatement (Third) of Restitution and Unjust Enrichment § 51 comment f………..5

Scwhwarzer & Tashima, et al., *Federal Civil Procedure Before Trial:  Calif.*

    *& 9th Cir. Edition*, ¶¶ 10:3.1 (2014)……………………………………..25

Scwhwarzer & Tashima, et al., *Federal Civil Procedure Before Trial:  Calif.*

    *& 9th Cir. Edition*, ¶ 14:340 (2014)……………………………………...14

## I.      INTRODUCTION

Based on the Court's prior rulings, Delaware law, and the undisputed facts, the court should grant summary judgment in Tenedora's favor.  None of Plaintiffs' claims are viable as a matter of law.  The issues in this case come down to the interpretation of contracts (a judicial function), discerning Delaware law (likewise), and, in a few instances, material factual issues that are undisputed.  (And to the extent the court finds that not all claims are amenable to summary judgment, it could and should grant partial summary judgment on the remainder.)

## II.     THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF TENEDORA ON ALL OF PLAINTIFFS' CLAIMS[1]

### A.      Plaintiffs' Claim For Breach of Fiduciary Duty Fails as a Matter of Law.

Plaintiffs fourth and fifth claims for relief assert three theories that Tenedora breached fiduciary duties it owes them; all fail as a matter of law.

#### 1.      Plaintiffs' Claim That Tenedora Breached Fiduciary Duties by Converting Series A and C to Common Stock is Barred by Law of the Case.

Plaintiffs' fifth claim for relief asserts that Tenedora breached fiduciary duties it owed Plaintiffs when it automatically converted Neology's Series A, C, D, E, and F Preferred Stock.  *See* Third Amended Complaint (TAC), ¶¶ 59-63.  However, the Ninth Circuit held in the interlocutory appeal in this matter that that claim is not actionable.  *See Swortwood, et al. v. Tenedora de Empresas, S.A. de C.V.*, 2014 WL 1664480, at *1-2 (9th Cir. April 28, 2014).  This holding is law of the case and disposes of this issue.  *See, e.g., Vizcaino v. United States Dist. Ct. for W. Dist. Of Wash.*, 173 F.3d 713, 719, amended 184 F.3d 1070 (9th Cir. 1999).

---

[1] Since the parties have previously extensively briefed the facts in this matter, they are not repeated here; to the extent necessary, Tenedora directs the court to its factual recitations and supporting evidence in opposition to the three preliminary injunction motions Plaintiffs have filed in this action.  *See* Dkt. Nos. 14, 63, (as corrected by 78), and 112 and supporting documents.  Likewise, where evidence relevant to this motion has previously been submitted and authenticated, rather than resubmit it here Tenedora refers to it by docket number and exhibit and/or page number.

2.      **Plaintiffs' Claim That Tenedora Breached Fiduciary Duties Simply By Acquiring the ChinaVest Shares Has No Support in Law.**

Plaintiffs' fourth claim for relief alleges that Tenedora's acquisition of the ChinaVest shares in and of itself breached fiduciary duties. *See* TAC, ¶¶ 52-54, 61. As this court has already held, however, this claim is premised on Plaintiffs' other claims of breach of contract and fraud (discussed below), and Plaintiffs have failed to identify any "authority establishing the existence of an independent fiduciary duty" that would prohibit Tenedora from acquiring the ChinaVest shares. May 19, 2014 Order [Dkt. 90], at 9-10. There is indeed no such authority. This claim fails as well.[2]

3.      **Plaintiffs' Theory Regarding Tenedora's Alleged Misappropriation of Neology's Assets Fails For Multiple Reasons.**

Plaintiffs' fourth claim for relief also alleges that Tenedora breached fiduciary duties it owes Plaintiffs by allegedly misappropriating Neology's assets and then later acquiring the ChinaVest shares. *See* TAC, ¶¶ 55, 58; *see also*, ¶ 30. (This allegation is also the subject of Tenedora's currently-pending motion to strike or in the alternative dismiss on the ground it is a derivative claim, *see* Dkt. No. 116.) This claim fails as a matter of law, however, as (1) the acquisition of the ChinaVest shares was not part of the challenged transaction; and (2) because Tenedora would have acquired the ChinaVest shares in any event.

a.      **The Claim Fails as The Acquisition of the ChinaVest Shares Was Not Part of the Challenged Transaction.**

Plaintiffs' theory here is that Neology made an unauthorized distribution of funds to Tenedora and Tenedora thereafter purchased the ChinaVest shares. *See* TAC, ¶¶ 69-70. However, even assuming the truth of these allegations (viewed either as Tenedora receiving Neology's funds or receiving back its own), that challenged transaction harmed, if anyone, only Neology and not Plaintiffs.

---

[2] To the extent the allegation is that Tenedora breached fiduciary duties by making misrepresentations in connection with this transaction, that allegation is discussed in Section II.D, *infra*, addressing Plaintiffs' misrepresentation claims.

If the funds were in fact Neology's, that transaction would harm Neology, and Plaintiffs only derivatively.  *See, e.g.*, *Smith v. Smitty McGee's, Inc.*, 1998 WL 246681, at *2-3, 7 (Del. Ch. May 8, 1998) (claims of misappropriation of corporate assets derivative).  Whether viewed as a "special benefit" to Tenedora or a failure to disclose the transaction to Plaintiffs (*see* TAC, ¶ 55), the challenged transaction itself did not harm the Plaintiffs.  And Plaintiffs have never been able to point to any authority or agreement—because none exists—that obligated Tenedora to inform them it intended to acquire the ChinaVest shares.  So Tenedora's subsequent acquisition of them, in a separate transaction (*see* Dkt. No. 63-1, Ex. D, pp. 19-23 [Stock Transfer Agreement]; Dkt. No. 91-3, at 123 Tenedora wire to ChinaVest]), cannot be linked, legally, to the earlier, challenged transaction of the payment by Neology to Tenedora.

And if the challenged transaction is viewed as repayment of an unauthorized loan, the result is the same (and under that theory, Neology was not even harmed, as it paid no interest, *see* Dkt. No. 112-3, [Martinez 7/9/14 Decl.], ¶¶11, 17).  Again, the challenged transaction was the repayment of a loan, which did not harm Plaintiffs; and there is no authority or agreement that would require Tenedora to disclose what it intended to do with its money after it was repaid on that loan; it had no independent obligation to tell Plaintiffs it intended to purchase the ChinaVest shares.  Plaintiffs' claim here simply does not work.

**b.      The Claim Fails for Lack of Causation Because Tenedora Would Have Bought the ChinaVest Shares Anyway.**

Further, even if it is assumed that Tenedora was in fact obtained "Neology's money" when it received payment from Neology in January 2010 and that this transaction harmed Plaintiffs directly, the claim fails as a matter of law for lack of causation.

Plaintiffs' claim is premised on the purported link between Neology paying Tenedora in January 2010 and Tenedora's subsequent acquisition of the ChinaVest

-3-

shares—all of their alleged injuries purport to flow from Tenedora's acquisition of that stock.  *See* TAC ¶¶ 55-57.  But it is undisputed—indeed, Plaintiffs have conceded—that Tenedora and Mr. Burillo had the funds necessary to buy the ChinaVest shares many times over even without receiving that payment from Neology, and that they would have bought them even had Tenedora not received that payment.  *See* Dkt. No. 112-1, ¶ 7; 112-5, at 27 ("[Tenedora's] loaded.  They've got all kinds of money."), 31 ("It's not that Tenedora needed the money."), 33 ("[$374,000 is] peanuts for Tenedora."); *see also*, Dkt. No. 112-1 [Diez Barroso 7/14/14 Decl.], ¶ 7.  Given this undisputed, conceded fact (not to mention the fungible nature of cash), and controlling Delaware law, causation necessarily fails.

Delaware follows "the traditional 'but for' definition of proximate causation." *Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 828 (Del. 1995) (citing, *inter alia*, *Laws v. Webb*, 658 A.2d 1000, 1007 (Del. 1995).  Its "[T]ime-honored definition of proximate cause is that direct cause without which [the injury] would not have occurred."  *Id.* (citing, *inter alia, Laws*, 658 at 1007).  Here, the alleged harm to Plaintiffs (acquisition of the ChinaVest shares, which allowed conversion of Series A) would, everyone agrees, have occurred *even without* Neology's January 2010 payment to Tenedora, as Tenedora would have bought the ChinaVest shares anyway.  As such, Plaintiffs cannot establish causation between the allegedly wrongful act (taking money from Neology) and their alleged consequent harm (the ChinaVest share acquisition and subsequent conversion of Series A).  Their claim fails for this reason as well.

Plaintiffs have argued that result is foreclosed by the (non-controlling and now superseded) Restatement (Second) of Torts.  *See* Dkt. No. 104, at 9-10.  However, the sections they cited (431 and 432) concern the concept of "substantial factor" causation, something Delaware has rejected in favor of its "but for" test.  *See Duphily v. Delaware Elec. Co-op, Inc.,* 662 A.2d at 830 n.7.  Moreover, even on its own terms, Plaintiffs' argument is inconsistent with the very Restatement sections they

-4-

1   cite.  Section 431 states that a wrongful act is the "legal cause" of the harm if it is a

2   "substantial factor" in bringing it about.  Rest., 2d, Torts, § 431.  Section 432, in turn,

3   defines what is *not* a "substantial factor"—and thus not a legal cause of the harm:

4   "(1) Except as provided in Subsection (2), *the actor's wrongful conduct is not a*

5   *substantial factor in bringing about the harm to another if the harm would have been*

6   *sustained even if the actor had not [acted wrongfully].*"  Rest, 2d, Torts, § 432(1)

7   (emphasis added).  And Subsection (2)'s exception only applies to situations—unlike

8   here—where *multiple* forces caused the harm: "(2) If two forces are actively

9   operating, one because of the actor's [wrongful act], the other not because of any

10  misconduct on his part, and each of itself is sufficient to bring about harm to another,

11  the actor's [wrongful act] may be found to be a substantial factor in bringing it

12  about."  *Id.*  Since the exception does not apply, the general rule of Subsection (1)

13  does:  there is no causation if the harm would have happened anyway.

14      In any event, Delaware law is clear that there is no causation if the injury

15  would have occurred even without the alleged misconduct.  *Duphily*, 662 A.2d, at

16  828.  And as a matter of simple logic and basic common sense, the result could

17  hardly be otherwise.  Plaintiffs' claim fails for lack of causation.

18      Plaintiffs later argued that this rule of causation does not apply under Delaware

19  law if the claim is one for breach of fiduciary duty.  The authorities they cited,

20  however, did not support their position.  *See* Dkt. No. 113, at 17-19.  *Thorpe v.*

21  *Castleman*, 676 A.2d 436, 437, 445 (Del. 1996) is unhelpful to Plaintiffs.  It does not

22  concern the issue at hand—does causation exist if the alleged harm would have

23  occurred anyway?; rather, the court in *Thorpe* awarded damages that were but-for

24  caused by the wrongful conduct (expenses the corporation would not have incurred if

25  not for the breach of fiduciary duty).[3]  *See id.* at 445.

26  _____

27      [3] Nor does Plaintiffs' citation to the Restatement (Third) of Restitution and
    Unjust Enrichment § 51 comment f (to the extent even relevant to an analysis of

28

1   Delaware law requires the alleged wrong be the but-for cause of the harm;

2   Plaintiffs' claim therefore fails.

   **B.    Plaintiffs' Breach of Contract Claim That the Automatic**
3   **Conversion Violated the Certificate of Incorporation Fails as a**

4   **Matter of Law.**

5   Plaintiffs' first claim for relief (denominated as one for declaratory relief),

6   alleges that Tenedora's automatic conversion of Neology's Series A and C Preferred

7   Stock breached Neology's Eighth Amended and Restated Certificate of

8   Incorporation; it is their contention that that agreement contains an implied term

9   prohibiting Tenedora from exercising its conversion right absent some independent

10  business reason beyond seeking to increase its share of the merger consideration. *See*

11  TAC, ¶¶ 37-39.

12  However, as a matter of law, Delaware law will not imply such a term. As

13  stated in the Delaware Supreme Court's most recent (and controlling)

14  pronouncement on the implied covenant, it is "a limited and extraordinary legal

15  remedy." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) (*en banc*). It cannot

16  be used to "infer language that contradicts a clear exercise of an express contractual

17  right." *Id.* at 1127; *see also, e.g., Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872,

18  888 (Del. Ch. 2009) ("The implied covenant cannot be invoked to override the

19  express terms of the contract."). Further, "The implied covenant only applies to

20  developments that could not be anticipated, not to developments that the parties

21  simply failed to consider—particularly where the contract authorizes the [defendant]

22  to act exactly as it did." *Nemec*, 991 A.2d at 1126. It is "not an equitable remedy

23  for rebalancing economic interests after events that could have been anticipated, but

24  were not, that later adversely affected one party to a contract." *Id.* at 1128. Doing so

25  would grant plaintiffs "contractual protections they failed to achieve at the bargaining

26  
27  Delaware law) help them. For that comment states "A finding that the defendant
   would have realized the profit in any event may support a judicial conclusion that the
   principles of unjust enrichment do not require that the profit in question be
28  surrendered to the victim of the wrong." *Id.*

table." *Aspen Advisors, LLC v. United Artists Theater Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd,* 871 A.2d 1251 (Del. 2004) (*en banc*).  It would have the court "substitute its notions of fairness for the terms of the agreement reached by the parties." *Frontier Oil Corp. v. Holly Corp.*, 30 Del. J. Corp. L. 993, 1043 (Del. Ch. 2005) [avail. at 2005 WL 1039027].

Here, the language at issue allows conversion of a series by "written consent or agreement" of a majority of that series. *See* Dkt. No. 81 [2/19/13 Pancoast Decl.], Ex. A [Neology's 8th Amended and Restated Certificate of Incorporation], § FOURTH.B.4.b.  To read in a limitation that this right can only be exercised for some independent business reason (apart from the converting party's economic interest) would indeed impermissibly re-write the parties' agreement.  Neology's COI was renegotiated and amended as part of the creation of the Series C Preferred Stock. *See* Dkt. No. 63-1 [Diez Barroso 12/26/13 Decl.], ¶ 7 & Ex. A.  As the Court found in its May 19, 2014 Order, Plaintiffs therefore "had the opportunity to bargain for limitations on the exercise of the power to automatically convert, including a 'valid purpose' requirement, but did not." 5/19/15 Order [Dkt. No. 90], at 11.  And as the Court further correctly found in that Order, at that time "it could have been anticipated that one day, Plaintiffs might not be part of the majority choosing to exercise their right to convert and that Plaintiffs might disagree with the decision for whatever reason.  Plaintiffs now regret that they did not bargain for limitations on the right to automatically convert . . . ." *Id.* at 12.  As such, their claim fails.

Plaintiffs have previously tried to rely on *Amirsaleh v. Board of Trade*, 2008 WL 4182998 (Del. Ch. Sept. 11 2008).  There, the Court of Chancery applied the implied covenant with respect to whether a corporation could exercise its discretion to accept or reject late filed election forms in a merger. *Id.* at *9.  As this court correctly held in its May 19, 2014, Order, that distinguishes it from this case; *Amirsaleh* involved "discretion to implement the terms of a contract," whereas here "Under the express terms of the Certificate, majority consent or agreement triggers

the automatic conversion of the shares.  Once the triggering event occurs, there is no discretion regarding implementation." 5/19/14 Order at 12.  Indeed, *Nemec* itself distinguished *Amirsaleh* on similar grounds.  In the face of the *Nemec* dissent's attempt to argue that exercise of an option amounted to an exercise of "discretion," *Nemec*, 991 A.2d at 1132 n.44 (Jacobs, J., Dissenting), the majority responded that "The Stock Plan [in *Nemec*] specifically grants [the defendant] the right to exercise an option to redeem Plaintiffs' shares.  [Cite.]  In *Amirsaleh*, there is no such right." *Id.* at 1128 n. 23.  So too here is Tenedora specifically granted the right to convert the shares.

Plaintiffs also have attempted to rely on *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400 (Del. 2013).  As noted by this Court, that case involved the situation where a general partner "breached the implied covenant of good faith and fair dealing in a limited partnership agreement by attempting to insulate itself from charges of bad faith in connection with two transactions by improperly trying to take advantage of safe harbor and good faith presumption provisions of the Delaware revised Limited Partnership Act." 5/19/14 Order [Dkt. No. 90], at 12-13.  In other words, the "general partner owed a *contractual fiduciary duty* to the limited partnership" and thus was subject to an implied covenant claim if it "attempted to avoid its duty by arbitrarily and unreasonably taking advantage of the safe harbor and good faith presumption provisions." *Id,* at 13.  But as this Court found, here in contrast, there is no contractual fiduciary duty as under the Limited Partnership Act provisions in *Gerber*; and Plaintiffs cannot use the implied covenant to "impose upon Tenedora a 'free-floating' duty to look out for the interests of the minority shareholders of the preferred shares." *Id.*

Indeed, this Court's conclusion was spot-on, as shown when it examined the facts of *Nemec* and compared them to the facts here—which are strikingly similar. *Nemec* involved a corporation that exercised a right under its stock plan to redeem its retired officers' stock prior to the close of a merger; that action cost the officers

significant sums that they otherwise would have received in the transaction. *Nemec*, 991 A.2d at 1123. The plaintiffs' argument that this breached the implied covenant was rejected by the Delaware Supreme Court, which found that "the implied covenant will not infer language that contradicts a clear exercise of an express contractual right" and that "a party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party." *Id.* at 1127-28. Thus, as this court concluded, this case is like *Nemec* in that Plaintiffs here "wish for the Court to re-balance economic interests now that they are unhappy with their bargain." 5/19/14 Order [Dkt. No. 90], at 14.

Indeed, this case is precisely like *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381 (Del. 2010), where the Delaware Supreme Court found that holders of a series of preferred stock whose shares were automatically converted for purely economic reasons, causing them to lose their liquidation preferences, could not now obtain an "opt out" right from conversion (as holders of another series of preferred had bargained for and obtained) as "they did not bargain for or obtain . . . that right. They cannot now obtain from the courts a right they failed to achieve at the bargaining table." *Id.* at 391. Exactly. Plaintiffs' implied covenant claim fails as a matter of law.

**C.** **Plaintiffs' Claim That Tenedora's Purchase of the ChinaVest Shares Breached the Voting Agreement Fails as a Matter of Law.**

Plaintiffs' third claim for relief alleges that Tenedora's purchase of the ChinaVest shares breached the Voting Agreement. *See* TAC, ¶¶ 44-51. This claim also fails as a matter of law.

**1.** **The Failure to Amend the Voting Agreement Before Acquiring the ChinaVest Shares Did Not Breach it.**

Plaintiffs have argued that the Voting Agreement allowed the Swortwoods to effectively block the transfer of shares by requiring their consent to it and that the failure to obtain that consent breached the agreement. As a matter of law, they are wrong.

First, there is no claim that the documents creating the Series A shares (which were re-negotiated and amended when Tenedora came on board and the Series C Stock was created, *see* Dkt. No. 63-1 [12/26/13 Diez Barroso Decl.], ¶ 7 & Ex. A) prohibited their transfer without the consent of other Series A holders, as could have been (and often is) agreed to through a provision in their Right of First Refusal Agreement if the parties had desired. *See* Declaration of Paul A. Reynolds Dated 8/15/14 (Reynolds Decl.), Ex. A [Greenspan deposition excerpts], 24:3-9. Further, the Voting Agreement itself does not require the consent of other shareholders for the transfer of shares. *See* Dkt. No. 12-1 [Pancoast 2/27/13 Decl.], Ex. B [Voting Agreement]. There is simply no "blocking provision" in the Voting Agreement requiring some or all parties to the agreement to approve of or consent to the transfer of shares held by its signatories. Indeed, Plaintiff Greenspan admitted in a letter to Plaintiff Pancoast that the transfer of the ChinaVest shares did not "require[] the consent of any shareholder." Greenspan Decl. [Dkt. 59-3], Ex 4.

Plaintiffs implicitly recognize this fact, as they rely solely on implied and express good faith duties, as opposed to express terms, for their contention that Tenedora could not acquire these shares without the Swortwoods' consent. *See* Dkt 59-1, at 11. However, the "further assurances" provision they rely on (§ 19) merely says the parties will perform in a manner to "effectuate in good faith the intent of the parties"—and since the intent of the parties does *not* include the right of another party to block transfer of shares, that good faith requirement does not prohibit transfer. The analysis for the implied good faith duty is the same. "Existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996). It is "not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

Since no shareholder consent is needed to transfer the shares, Plaintiffs try to backdoor such a requirement into the Voting Agreement by arguing that agreement was breached because under Section 8 Neology was not permitted to transfer the shares without an amendment to the Voting Agreement, which they would have had to sign but claim would not have unless all parties agreed to a super-majority voting provision to prevent conversion.  Dkt No. 59-1, at 12.  However, that is not what Section 8 says; what is *actually* says, in full, is this:

> <u>Successors in Interest</u>.  The provisions of this Agreement shall be binding upon the successors in interest to any of the shares of the Company's capital stock held by [the stockholder parties].  The company shall not permit the transfer of any shares of such capital stock on its books or issue new certificates representing any shares of such capital stock unless and until *the person(s) to whom such shares are to be transferred shall have executed a written agreement, substantially in the form of this agreement, pursuant to which such transferee becomes a party to this agreement, and agrees to be bound by all the provisions hereof as if such transferee was a party hereunder.*

*See* Dkt. No. 12-1 [Pancoast 2/27/13 Decl.], Ex. B [Voting Agreement], at § 8 (emphasis added).

Here, of course, Tenedora was *already a party* to the Voting Agreement, so such a procedure was unnecessary.  Moreover, even were that not the case, the provision does *not* allow any other shareholder to block a transfer of shares by refusing to sign an amendment to the voting agreement to add the transferee.  Indeed, no other party's signature is even required; per the language of Section 8, the transferee merely has to "agree to be bound by" (i.e., sign a joinder) the terms of the Voting Agreement.  This provision, in other words, is not conditioned on the consent of the other parties; it and only requires the transferee join the agreement.  This conclusion becomes all the more inevitable when examining Section 11 ("Amendments and Waivers"), which sets for a detailed procedure for actually amending the agreement: requiring the consent of (a) Neology, (b) the Key Series C Holder of its assigns, (c) holders of the Series A Supermajority or their assigns, and

(d) the Key Common Majority or their assigns. *Id.*, § 11.  This is in contradistinction to the joinder procedure provided for transfer to "successors in interest" under Section 8 (transferee merely agreeing to be bound by the existing agreement).

An examination of the operation of the Company's Certificate of Incorporation and the Voting Agreement shows why it was only necessary for the successor in interest/transferee to agree to join the Voting Agreement, not to require its amendment and the consent of all other parties, for the shares to be able to be transferred.  The Certificate of Incorporation (section FOURTH, 3, c) provides that the holders of a majority of Series C Preferred Stock have the right to elect one director, the majority of Series A Preferred Stock the right to elect two directors, and the majority of the preferred and common stock, voting together, have the right to elect two directors. *See* Dkt. No. 8-1 [Pancoast 2/19/13 Decl.], Ex. A.

What the Voting Agreement does, its function, is require its stockholder parties to all vote all of their shares in favor of designees of specified persons.  For example, all shareholder parties agree to vote all their shares in favor of the "Series C Nominee" designated by Tenedora (§ 1); and likewise agree to vote all their shares for the two "Series A Nominees," one of which is designated by the Swortwoods and the other by ChinaVest (§ 2).  Thus, after ChinaVest sold its shares to Tenedora, Tenedora, as a party to the Voting Agreement, was, for example, required to vote the transferred Series A stock in favor of the Swortwoods' Series A designee.[4]  This obligation existed without any need to amend the Voting Agreement, as Tenedora was already a party to it (and even if Tenedora had not already been a party to the agreement, this could have been accomplished via signing an agreement joining it as

---

[4] This, in fact, is the point of the Voting Agreement: to ensure that its shareholder parties would be guaranteed that their nominee would remain on the Board for so long as they held their shares; it was *not* to "maintain the balance of power" by preventing other parties holding shares with nomination rights from selling their shares and, hence, those nomination rights (see discussion below regarding how the nomination rights follow the shares to "successors in interest"). That would be accomplished—but was not here—through a provision in the Right of First Refusal Agreement.

required by Section 8—*i.e.*, agreeing to vote its shares as provided in the Voting Agreement). The voting agreement simply does not prohibit the transfer of the ChinaVest shares to Tenedora, and Plaintiffs cannot bootstrap the fact that transferees must join the agreement into a blocking right to prohibit transfer. (The Court's May 19, 2014, Order seems to agree. *See* 5/19/14 Order [Dkt. No. 90], at 7.)

Another argument Plaintiffs have made is that the company would be rendered "dysfunctional" without an amendment to the voting agreement, as there would be no one to designate the "ChinaVest director." Dkt. 57-1, at 5. This argument, however, assumes that the right to appoint that director did not pass with the ChinaVest shares. In fact, the plain language of the Voting Agreement shows that that right *did* follow the shares to Tenedora. Section 12 ("Assignments") provides that "No rights under this Agreement are assignable" but then continues in the next sentence to state that "Nothing contained in this agreement is intended to confer upon any person or entity, other than the parties hereto *and their successors in interest*, any rights or remedies under or by reason of this Agreement unless expressly so stated to the contrary." *See* Dkt. No. 12-1 [Pancoast 2/27/13 Decl.], Ex. B [Voting Agreement], § 12 (emphasis added). The italicized language indicates that one who is transferred a party's shares also obtains that party's rights and remedies under the agreement. This can be seen all the more from reference to Section 8, "Successors in Interest" (not coincidentally the same term used in Section 12, as highlighted above). As seen, that section applies where a party's shares are transferred to another. Thus, one whom succeeds to a party's shares under section 8 (a successor in interest) obtains that parties' rights and remedies under Section 12. (Again, the Court appears to have agreed with this analysis in its May 19, 2014, Order. *See* 5/19/14 Order [Dkt. No. 90], at 7.)[5]

---

[5] Even assuming the right to appoint a director did not pass with the shares to Tenedora, that would still not render the company "dysfunctional." For the Company's Certificate of Incorporation and the Voting Agreement itself provide that the company Board of Directors shall be "five to seven" directors. *See* Dkt. No. 8-1

And as the Court also recognized, if there was no requirement that the Swortwoods consent to an amendment to allow the shares to transfer, they would have no ability to require a provision providing for a supermajority vote to convert the shares and thus no ability to effectively block the transfer of the ChinaVest shares if the other parties to the Voting Agreement did not agree to these terms.  *See* 5/19/14 Order [Dkt. No. 90], at 8.  In sum, the transfer of the ChinaVest shares did not breach the Voting Agreement.[6]

**2.  Even Assuming The Voting Agreement Did Need to Be Amended for the Right to Designate the ChinaVest Director to Transfer With the Shares, that Did Not Cause the Harm Plaintiffs Complain Of.**

Independently, even assuming the right to designate the former ChinaVest director did not pass with the shares to Tenedora, that did not cause the harm about which Plaintiffs complain—the loss of their liquidation preferences in their Series A shares by Tenedora's automatic conversion of that series. [7]

---

[Pancoast 2/19/13 Decl.], Ex. A. [COI], § FOURTH.3. b.; *See* Dkt. No. 12-1 [Pancoast 2/27/13 Decl.], Ex. B [Voting Agreement], at Recital D.  In other words, there is no requirement that both Series A directors (one of which ChinaVest had the ability to designate serve on the Board at any given time).  This is also another reason why Plaintiffs' "balance of power" argument misses the mark.

[6] Tenedora does not address Plaintiffs' theory that the ChinaVest acquisition breached the Stock Purchase Agreement between ChinaVest and Tenedora because that claim is not part of the pleading and, indeed, the court expressly denied Plaintiffs' attempt to add it to the pleadings as untimely.  *See* Dkt. No. 109.  Of course, theories that are not pled cannot be used to avoid summary judgment.  *See* Scwhwarzer & Tashima, et al., *Federal Civil Procedure Before Trial:  Calif. & 9th Cir. Edition*, ¶ 14:340 (2014) (citing, *inter alia, Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (affirming grant of summary judgment where civil conspiracy theory raised to avoid summary judgment had not been pled:  "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.").

[7] As to Series C, Tenedora achieved its majority, and thus the right to automatically convert, because the Swortwoods, not wishing to invest more than a token additional amount in that series, expressly waived their right to a *pro rata* participation in a later round of Series C financing.  *See* Dkt. 63-1 [Diez Barroso 12/26/13 Decl.], ¶ 8 & Ex. B.

-14-

This is because no director action or approval is necessary to automatically convert—rather just a majority vote of the series— and as such the replacement of Brownrigg and Perez with Orvañanos and Cropper had nothing to do with Tenedora's ability to convert or Plaintiffs' claimed harm from the conversion.  So any claim that director designation caused Plaintiffs' loss of their liquidation preference on Series A fails for lack of causation of the alleged damages.  *See, e.g., WaveDivision Holdings, LLC v. Millenium Digital Media Systems, L.L.C.*, 2010 WL 3706624 *13 (June 18, 2010) (no contract claim if damages not caused by breach).

Plaintiffs' have claimed this is not so, arguing that in fact Neology's Board "approved" the automatic conversion.  *See* Dkt. No. 72, at 7.  As a matter of law, however, it did not—nor did it have the power to approve or disapprove the conversion even had it tried.  The Board resolution approving the merger agreement by its plain language did just that; it plainly resolves to approve "the Merger Agreement"—and not the conversion exercise.  Dkt. No. 63-1 [Diez Barroso 12/26/13 Decl.], Ex. L at 71.  That the fact that conversion was "expected" to occur was mentioned in a recital (*not* a resolution) does not mean the Board was "approving" the conversion.  Indeed, the recital said that it was "anticipated" that Tenedora would "cause" the conversion shortly before the merger, not that it was being approved.  *Id.* at 69.  And that the resolution authorized the entry into "such other agreements" referenced in the Merger Agreement or deemed necessary to consummate the merger does *not* refer to the conversion—the conversion is not mentioned once in the Merger Agreement or the supporting agreements referenced in it.  *See* Dkt. No. 12-1 [Pancoast 2/27/13 Decl.], Ex. A, pp. 34-145 [Merger Agreement].  Further, the Delaware Supreme Court has specifically held that a merger and an automatic conversion executed right before it are separate transactions.  *Alta Berkeley*, 41 A. 3d at 389 ("Although the two events [the automatic conversion and the merger] were 'related' sequentially, they cannot be fused together so as to become 'related' legally . . . .").  Finally, to the extent the

-15-

document is not plain on its face on this issue, John Cleary, Neology's lead lawyer on the merger transaction, testified that it was his intent that the Board would only vote to approve the merger and not the conversion, and that that is therefore what it was intended the document mean. *See* Reynolds Decl., Ex B. [excerpts of Cleary deposition], 57:6-84:11 (esp. 558:19-60:18; 71:3-73:4; 82:5-84:11)  This is because under Delaware law, the Board cannot "approve" or "disapprove" a conversion exercise—it is the shareholders' right. *Id.*

Mr. Cleary was unquestionably right on the law.  Indeed, even if the resolution approving the merger could be interpreted as somehow "approving" the conversion, that act would be a nullity.  That is because a corporation has *no ability* to reject an automatic conversion—on the grounds that it would not be in the best interests of the corporation or some of its shareholders or otherwise.  In *Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997), a holder of preferred stock attempted to exercise its "absolute" right to convert its shares to common.  The corporation refused to honor the conversion, contending it had "an overriding fiduciary duty to act in the best interests of the corporation and its stockholders, which allows them to 'sacrifice' the interests of the convertible preferred stockholders for the greater good of the corporation and its shareholders generally." *Id.* at *1.  The court responded "that argument is palpably wrong as a matter of law, and merits swift summary rejection in the strongest possible terms." *Id.*  Calling the preferred conversion rights "fundamental contractual obligations," the court found that no fiduciary duty claim could trump them as "the entire foundation of securities law presupposes the sanctity of the bargain that defines the rights that the investors in the corporation acquire." *Id.* at 2.

The composition of the Board had no effect on Plaintiffs' alleged harm.  The Voting Agreement claim fails for this reason as well. (The Court's May 19, 2014, Order recognizes as much. *See* 5/19/14 Order [Dkt. 90], at 8.)

### 3. Independently, Plaintiffs' Voting Agreement Claim is Barred By Acquiescence.

Delaware law has a doctrine called "acquiescence." As described in the most recent Delaware case to discuss it, *Lehman Brothers Holdings, Inc. v. Spanish Broadcasting System, Inc.*, 2014 WL 718430 (Del. Ch. Feb. 25, 2014), acquiescence is a form of estoppel: "where a plaintiff has remained silent with knowledge of her rights" and the corporation or defendant has knowledge of that silence and relies on it to its detriment, "the plaintiff is estopped from seeking protection of those rights." *Id.* at *9 and n.56.

Here, Pancoast (the Swortwoods' Board designee) was informed by email on February 17, 2010 that Tenedora had purchased the ChinaVest shares and that Neology intended to cancel the ChinaVest share certificates and have them reissued to Tenedora. *See* Dkt. 72-1 [Pancoast 1/13/14 Decl.], ¶19 & Ex. A. Pancoast and the Swortwoods had knowledge of the Voting Agreement—the source of what they now allege is their right to prevent transfer of the shares without their consent; the Swortwoods were signatories to it and Pancoast had it in his possession and later relied on it to prevent himself from being removed from the Board. *See* Reynolds Decl., Ex. C. [Pancoast deposition excerpts], 156:1-164:10; 213:14-216:24; Ex. D [Pancoast2/17/11 email]. Neology's CEO, Francisco Martinez, testified that had Pancoast claimed the Voting Agreement prevented transfer of the shares, he would have referred the issue to the Company's lawyers and that he proceeded in reliance on Pancoast's lack of objection in reissuing the shares to Tenedora. *See* Reynolds Decl., Ex. E [Martinez deposition excerpts], 219:9-220:20. Pancoast himself testified that the decision not to object was made with knowledge of the alleged Voting Agreement rights and was, in fact, a tactical decision—to "see how this plays out." Reynolds Decl., Ex. C, 158:11-161:5. He also failed to raise an objection with Tenedora—likewise for tactical reasons—which caused Tenedora to act in reliance by not asking Neology to have its lawyers look into the issue or to involve its own

lawyers in the issue.  *Id.* at 164:2-8.  Because Pancoast did not object, Neology reissued the shares and Tenedora took all subsequent actions with the understanding the shares had been properly transferred to it.[8]  This is textbook acquiesce.  As a matter of law, that doctrine bars the Voting Agreement claim.

### D. Plaintiffs' Misrepresentation Claims Fail as a Matter of Law.

Plaintiffs' fraud claims—their sixth claim for fraudulent misrepresentation (TAC, ¶¶ 74-80) and their seventh claim for negligent misrepresentation (TAC, ¶¶ 64-73)—also fail as a matter of law.  These claims are based on two theories: (1) that Tenedora made misrepresentations regarding making loans to Francisco Martinez and Barrie Cropper to allow them to purchase the ChinaVest shares; and (2) that Tenedora made misrepresentations in connection with its alleged misappropriation of Neology's funds.  Both theories fail.

### 1. The Claim That Tenedora Misrepresented it Would Loan Money to Martinez and Cropper to Buy the ChinaVest Shares Fails as a Matter of Law.

Under Delaware law both fraud and negligent misrepresentation claims require a false representation by the defendant.  *See, e.g., Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  As previously noted by Plaintiffs (Dkt. No. 59, at 14-15), this includes a defendant's failure to speak when it is necessary to speak to prevent affirmative statements made by the defendant from being misleading.[9]  *Id.*

---

[8] Similarly, Pancoast and Swortwood made the conscious decision not to object to having Orvañanos and Cropper placed on the Board; in fact, Pancoast expressly approved of that action.  Reynolds Decl., Ex. C [Pancoast deposition excerpts], 168:8-179:7; Dkt. No. 63-1 [Diez Barroso Decl.], ¶ 23 & Ex. H [Board minutes].

[9] To the extent Plaintiffs are claiming that Tenedora's fiduciary duty to them required it to affirmatively disclose to them, in the absence of any other statement by Tenedora to them on this topic, its intent to acquire the ChinaVest shares (*see* TAC, ¶ 67), there is no authority for the proposition that Tenedora had any such duty.  *See* 5/19/14 Order [Dkt. 90], at 9-10.

Here, Plaintiffs do not claim Tenedora made any false statements to them directly [*see* Dkt No. 72 at 8-9]; rather, the claim is that Tenedora told Francisco Martinez that it would loan him and Barrie Cropper money to buy the ChinaVest shares, that Martinez told that to Cropper, and that Cropper told that to Plaintiff Greenspan, ChinaVest's attorney.  *See* TAC, ¶¶ 66, 75 ("Tenedora falsely represented to Francisco Martinez, Barrie Cropper, and/or others that it would aid Francisco Martinez, Barrie Cropper, and/or others in purchasing the ChinaVest shares."); *see also* Dkt. No. 72, at 8-9; Reynolds Decl., Ex. A. [Greenspan deposition excerpts], 139:12-149:19.  This is the *only* misrepresentation alleged under Plaintiffs' first theory.  *See* TAC, ¶¶ 66, 75

Even assuming that a misrepresentation to a third party is actionable under Delaware law, however, there is no admissible evidence to support the contention that Tenedora promised Martinez and Cropper it would loan them money to buy the ChinaVest shares.  Tenedora maintains it never agreed to loan Martinez and Cropper the money.  Reynolds Decl., Ex. E. [Diez Barroso deposition excerpts], 30:7-18; 138:13-140:7; 151:20-159:21; Dkt. No. 63-1 [Diez Barroso 12/26/13 Decl.], ¶¶ 12, 13.  Martinez has testified the same, and that he never told Cropper that Tenedora had so agreed.  Reynolds Decl., Ex. E [Martinez deposition excerpts], 33:15-34:15; 48:19-53:2460:23-62:20; 70:9-70:7; 124:10-14; 134:2-12; 155:14-24.  Cropper is deceased; we will never know his testimony.  Greenspan *claims* Cropper told him that Tenedora had agreed to loan he and Martinez the money to buy the shares.  Reynolds Decl., Ex. A. [Greenspan deposition excerpts], 139:12-149:19; 160:10—161:10; Dkt. No. 57-3 [Greenspan 11/13/13 Decl.], ¶¶ 12-22; Dkt. No. 18-1 [Greenspan 3/18/13 Decl.], ¶¶ 10-12.  But this is inadmissible hearsay—Greenspan is attempting to show that Cropper was *actually* promised a loan by Tenedora, so it is being offered for the truth of the matter asserted.  Further, none of the "unavailability" or other hearsay exemptions or exceptions apply.  Indeed, this is a classic example of why the hearsay rule exists:  if someone is going to testify about

what Tenedora told Cropper, it has to be Cropper; it is unreliable in the extreme to have the self-interested Greenspan testify about what Tenedora supposedly told Cropper.  So the extent the misrepresentation claims are based on alleged Tenedora statements agreeing to loan Martinez and Cropper the money to buy the shares—the *only* alleged false statement under Plaintiffs first theory, and fraud, of course, must be pled with particularity—the claim fails.

Further, even were that not so, the fraud claims would still fail as a matter of law.  For it is undisputed that Greenspan learned on December 17 that it was actually *Tenedora* who would be the purchaser and would have no obligation to transfer the shares to Martinez and Cropper.  Reynolds Decl., Ex. A. [Greenspan deposition excerpts], 216:13-218:17; Dkt. No. 57-3 [Greenspan 11/13/13 Decl.], ¶ 18; Dkt. No. 18-1 [Greenspan 3/18/13 Decl.], ¶ 11.  So any earlier alleged statements about Martinez and Cropper being the purchasers could not have been relied on by him (or ChinaVest)—indeed, it was Greenspan who revised the agreement to make Tenedora the purchaser and not be required to transfer them to Martinez and Cropper.  *Id.*

Nor can the Securities Transfer Agreement (STA) between Tenedora and ChinaVest save Plaintiffs' claim.  For one, the complaint does not allege it as a basis for the misrepresentation claims.  *See* TAC*, ¶¶* 64-80; *see also*, Transcript of May 29, 2014 hearing [Dkt No. 114] at 13:19-25 (the Court: "Look, if you spring up in the pretrial order or at trial this new theory, and it's not in the complaint, you're not going to present it to the jury.  Simple as that.  Fraud has to be pled with particularity, and I haven't read the complaint to see if you plead this, but you're indicating that you didn't plead this with specificity.").

Further, even if this argument could be properly considered, it fails on the merits.  The STA does note in a recital that Tenedora "desires" to transfer the shares to "management" but, as noted, the agreement in no way obligated Tenedora to do so.  *See* Dkt. No. 63-1 [Greenspan 11/13/13 Decl.], ¶ 19 & Ex. 7 [Greenspan version of STA].  Although Greenspan may claim he was told by Cropper that Tenedora was

-20-

still going to loan him and Martinez money to buy the shares (again, inadmissible hearsay), the agreement Greenspan drafted *did not require that action. Id.*; Dkt. No. 63-1 [Greenspan 11/13/13 Decl.], ¶ 19 & Ex. 7 [Greenspan version of STA]. The recital, in fact, is generally in line with Diez Barroso's testimony—that Tenedora intended to create a management incentive program that might involve the ChinaVest shares if it could come to a suitable arrangement with management to that end, and in fact continued with discussions to that end. *See* Reynolds Decl., Ex. F. [Diez Barroso deposition excerpts], 30:7-18; 138:13-140:7; 151:20-159:21; Dkt. No. 63-1; Dkt. 63-1 [Diez Barroso 12/26/13 Decl.], ¶¶ 12, 13, 19. But, in any event, the salient point is that Tenedora had no *obligation* to transfer the shares to Martinez and Cropper or any other "management" if such an arrangement could not be reached.[10]

Further, to the extent the recital was (1) in any respect inaccurate and (2) could, as mere recital, be relied upon by anyone, it was not material to and thus not relied on by ChinaVest—the counter-party, the only one who, if anyone could, was able to rely on it. ChinaVest, as shown by its not even trying to get Tenedora to agree to transfer the shares to management, plainly did not care if they were subsequently transferred or not. This is confirmed by the deposition testimony of its lawyer, Plaintiff Greenspan, who testified his client "didn't care" whether Tenedora

---

[10] Under Delaware law, recitals are not part of agreements and do not obligate the parties to do anything. *See, e.g., New Castle County v. Crescenzo*, 1985 WL 21130, *3 (Del. Ch. Feb. 11, 1985) ("[R]ecitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument."); *Perlegos v. Atmel Corp.*, 2007 WL 475453, *17 (Del. Ch. Feb. 8, 2007) ("[R]ecitals are generally not considered necessary parts of a contract . . . ."). True, the STA did "incorporate" the recitals (*See* Dkt. No. 63-1 [Greenspan 11/13/13 Decl.], Ex. 7 [Greenspan version of STA], § 9), but the fact remains that even the recital itself does not obligate Tenedora to transfer the shares to anyone; it does not do so by its terms, nor is it set out in the "Representations, Warrantees and Covenants of Transferee" section of the STA, Section 5; nor does *any* term of the agreement require transfer. Dkt. No. 63-1 [Greenspan 11/13/13 Decl.], Ex. 7 [Greenspan version of STA].

ultimately transferred the shares to Martinez and Cropper.  Reynolds Decl., Ex. A. [Greenspan deposition excerpts], 216:13-218:9.  ChinaVest indisputably could not care less who bought the shares or what they did with them; it merely and solely wanted to close a deal—any deal—by year-end.  *Id.*

Of course, this is not a case in which ChinaVest is claiming it was misled—it is *plaintiffs* who are making that claim.  Pancoast (the Swortwoods' representative) claims he was misled because Greenspan told him Cropper and Martinez would be the purchasers in a December 13, 2009 letter.  *See* Ex. 4 to Greenspan Decl. [Dkt. 59-3].  However, by December 17, Greenspan knew that Tenedora would in fact be the purchaser and, moreover, that it would have no obligation to transfer the shares to Cropper and Martinez under the proposed agreement he prepared.  *Id.*, ¶¶ 18-19 & Ex. 7.  And Greenspan testified that after he was aware of these facts and understood their implications for the Swortwoods' interests, he never called Pancoast back to give him another opportunity to see if the Swortwoods wanted to buy the shares in light of the fact the proposed transaction would give Tenedora majority control of Series A.  *See* Reynolds Decl., Ex. A. [Greenspan deposition excerpts], 220:18-222:8.  This is because he thought to do so might cause the deal—which his client was anxious to close—to fall apart.  *Id.*  ("I thought my duty to my client to conclude the deal was paramount at that point . . . .").  Under no legal theory can Tenedora be responsible for Greenspan's decision to not inform Pancoast that his earlier statements to him were no longer true.  And Tenedora, for its part, was not aware of those statements or even that Greenspan had spoken to Pancoast.  *See* Dkt. No. 63-1 [Diez Barroso 12/26/13 Decl.], ¶ 17.

Plaintiffs' fraud claim also independently fails in that they, as a matter of law, cannot prove reliance.  There is much evidence that the Swortwoods would not have bought the ChinaVest shares—including their failure to invest at follow-on Series C rounds in amounts that would maintain their *pro rata* position and prevent Tenedora from obtaining a majority of that series and hence the ability to convert it.  *See* Dkt.

63, at 23-24; Dkt. No. 63-1 [Diez Barroso 12/26/13 Decl.] ¶ 8 & Ex. B.  However, it was not until Pancoast filed a declaration with the Court on January 13, 2010, that the evidence existed *as a matter of law* that the Swortwoods would not have tried to buy the shares from ChinaVest had it known Tenedora would be buying them.  In that declaration, Pancoast, the Swortwoods' representative and someone whose advice they always took (*see* Reynolds Decl., Ex. C. [Pancoast deposition excerpts], 93:10-17; 160:14-161:5; Ex. G [D. Swortwood deposition excerpts], 13:4-22), *admitted* that even after he found out that Tenedora had acquired the shares it "never occurred to [him] that Tendora would "attempt to capture [the Series A] liquidation preferences for itself [through automatic conversion]."  Dkt. No. 72-1, ¶ 25.  This admission establishes a lack of reliance as a matter of law.  (The Court's May 19, 2014, Order seems to recognize this.  *See* 5/19/14 Order [Dkt. No. 90], at 9.)

### 2.    The Misrepresentation Claims Arising Out of Tenedora's Alleged Misappropriation of Neology's Assets Also Fail.

Plaintiffs' second theory for their misrepresentation claims arise out of Tenedora's alleged misappropriation of Neology's assets and subsequent acquisition of the ChinaVest shares.  *See* TAC, ¶¶ 68-72, 76-79.  The theory is that Tenedora failed to disclose that it intended to take Neology's money, and then later bought the ChinaVest shares and/or that it made misrepresentations "to the stockholders" that it had made a loan that Neology was repaying and then bought the shares.  *Id.*

The problems with this theory are the same as with respect to this aspect of Plaintiffs' breach of fiduciary duty claim:  it fails because (1) the purchase of the ChinaVest shares was not part of the challenged transaction and also (2) for lack of causation.  *See* §§ II.A.3.a.-b., *infra*.  (This portion of the misrepresentation claims is also subject to Tenedora's motion to strike/dismiss, on the ground that it is a derivative claim.  *See* Dkt. No. 116.)

Taking the first point first, a failure to disclose or misrepresentations regarding the alleged unauthorized distribution to Tenedora (*see* TAC, ¶¶ 68-69, 76) (whether

viewed as Tenedora being paid Neology's money or being repaid its own money it had loaned) harmed, at most only Neology; Plaintiffs cannot point to any law or agreement that Tenedora had the obligation to inform them of its intent to purchase the ChinaVest shares; so Tenedora's later purchase of those shares in a separate transaction cannot be linked to the alleged wrong of the payment by Neology to Tenedora.

And as to the second point, it is undisputed—conceded, actually—that Tenedora could and would have purchased the ChinaVest shares even without having received the payment from Neology.  This cuts off causation under established Delaware law.  (And Plaintiffs' arguments that causation is less rigorous for a breach of fiduciary duty claim has no application to their misrepresentation claims.) Delaware law requires the alleged wrongdoing be the but-for cause of any compensatory damages.

### E.    Plaintiffs' Ineffective Tender Claim is Factually Incorrect as a Matter of Undisputed Fact.

Plaintiffs' second claim is for declaratory relief; it seeks a declaration that Tenedora's exercise of the automatic conversion was "ineffective."  This is based on a reading of the COI that makes "conditional" automatic conversions improper, along with an "information and belief" allegation that the conversion in fact occurred after the merger (and which conversion thus was conditional and hence ineffective).  *See* TAC, ¶¶ 40-43.

Discovery showed, however, that Tenedora's automatic conversion was *not* conditioned on the merger closing.  Rather, in a notice dated December 5, 2011, and communicated to Neology through its counsel on December 13, Tendora gave notice that it was converting the preferred stock to common "effective December 16, 2011" and referenced no conditions precedent to the conversion occurring on that date.  *See* Reynolds Decl., Ex. H [Elias-Calles 12/13/11 email].  The merger did not close until

1  December 21, 2012—five days later.  TAC, ¶ 43.  As such, the automatic conversion
2  was properly effective under the COI.

3        **F.**    **Plaintiffs' Claims for Constructive Trust and Declaratory Relief**
              **Are Just Remedies and Fail Because All Their Substantive Claims**
4                **Do.**

5        Plaintiffs' eighth claim is for a constructive trust—i.e., a remedy—based on
6  (1) the automatic conversion and (2) the acquisition of the ChinaVest stock.  *See*
7  TAC, ¶¶ 75-79.  As shown above, Plaintiffs' claims based on those transactions fail;
8  as such the constructive trust remedy sought on the basis of those claims must fail as
9  well.  *See, e.g., Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654,
10  670 n.22 (Del. Ch. 2006) ("Unless a plaintiff can prove out a claim under a
11  recognized cause of action—such as one for fraud, breach of fiduciary duty, or unjust
12  enrichment—the plaintiff should have no eligibility for any remedy, including the
13  remedy of constructive trust.").

14        Similarly, Plaintiffs' ninth and final claim is for declaratory relief—also a
15  remedy.  *See* Scwhwarzer & Tashima, et al., *Federal Civil Procedure Before Trial:*
16  *Calif. & 9th Cir. Edition*, ¶¶ 10:3.1 (2014) ("Declaratory relief is a *procedural device*
17  for granting a remedy. It does not create any substantive rights or causes of action.")
18  (citing, *inter alia*, *DTND Sierra Investments LLC v. Bank of New York Mellon Trust*
19  *Co., N.A.*, 958 F. Supp. 2d 738, 753 (W.D. Tex. 2013)).  This "claim" seeks a
20  declaration that Tenedora (1) breached the Voting Agreement in acquiring the
21  ChinaVest shares; (2) breached fiduciary duties by converting the Series A and
22  Series C Preferred Stock to common shares; and (3) fraudulently acquired the
23  ChinaVest shares.  *See* TAC ¶¶ 86-91.  Since, as shown above, all of these claims
24  fail, the declaratory relief remedy sought on them must fail as well.

25  **III.**   **CONCLUSION**

26        The court should grant summary judgment in Tenedora's favor; at a minimum,
27  the court should grant partial summary judgment to the extent it finds the entire
28  action cannot be disposed of in this motion.

-25-

Dated:  August 14, 2014                    REYNOLDS APC

                                           By    /s/Paul A. Reynolds
                                              PAUL A. REYNOLDS
                                              Attorneys for Defendant
                                              Tenedora de Empresas, S.A. de C.V.

4811-5596-6235, v.  2